**United States District Court**
**Middle District of Pennsylvania**
**Harrisburg Division**

| | |
|---|---|
| **The PUBLIC INTEREST LEGAL FOUNDATION** | |
| *Plaintiff*, | |
| *v.* | |
| **ROBERT TORRES, in his official capacity as Acting Secretary of the Commonwealth of Pennsylvania, and JONATHAN M. MARKS, in his official capacity as the Commissioner of the Bureau of Commissions, Elections, and Legislation** | No. _____ |
| *Defendants*. | **COMPLAINT** |

**Complaint**

Plaintiff, by its attorneys, brings this action for violations of Section 8 of the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20507.

1.    According to statements by Commonwealth election officials, non-U.S. citizens have been registering and voting in Pennsylvania for decades. Defendants possess records and data showing the extent to which noncitizens are participating in the Commonwealth's elections. Federal law grants the public the right to inspect and duplicate that information. Defendants are shielding that information from the public, in violation of federal law.

1

2.      Plaintiff seeks injunctive relief to compel Defendants to comply with Section 8 of the NVRA. Specifically, Plaintiff seeks an order commanding Defendants to permit inspection and duplication of records concerning the maintenance of voter registration lists pursuant to 52 U.S.C. § 20507(i).

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because the action arises under the laws of the United States. This Court also has jurisdiction under 52 U.S.C. § 20510(b), because the action seeks injunctive relief under the NVRA.

4.      Venue in this Court is proper under 28 U.S.C. § 1391(b)(1), because Defendants reside in this district, and 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

5.      The Public Interest Legal Foundation, Inc. (the "Foundation") is a non-partisan, public interest organization headquartered in Indianapolis, Indiana. The Foundation seeks to promote the integrity of elections nationwide. The Foundation has dedicated significant time and resources to ensure that voter rolls in the Commonwealth of Pennsylvania, and other jurisdictions throughout the United States, are free from ineligible registrants, noncitizens, individuals who are no longer residents and individuals who are registered in more than one location.

6.     Defendant Robert Torres is the Acting Secretary of the Commonwealth of Pennsylvania. Defendant Torres is the Commonwealth's Chief Election Officer and administers the Pennsylvania Department of State, which is charged with the supervision and administration of federal and state election laws. *See, e.g.*, 25 Pa.C.S. § 1201, 1222.

7.     Defendant Jonathan M. Marks is the Commissioner of the Bureau of Commissions, Elections, and Legislation, a bureau of the Pennsylvania Department of State. Defendant Marks is responsible for planning, developing and coordinating statewide implementation of voter registration and list maintenance activities. *See, e.g.*, 25 Pa.C.S. § 1201, 1222; *see also* Pennsylvania Department of State, About Us, Jonathan M. Marks, http://www.dos.pa.gov/about-us/Pages/Commissioner,-Bureau-of-Commissions,-Elections,-and-Legislation.aspx.

## BACKGROUND

**The National Voter Registration Act**

8.     The NVRA provides that "[e]ach State shall maintain for at least 2 years and shall make available for public inspection . . . **all records** concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters. . . ." 52 U.S.C. § 20507(i)(1) (emphasis added).

9.      The only records exempted from the NVRA's public disclosure requirement are "records relate[d] to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered." 52 U.S.C. § 20507(i)(1).

**Registration Lists and Registration List Maintenance in Pennsylvania**

10.     In Pennsylvania, voter registration records are maintained by state and county officials using the Statewide Uniform Registry of Electors (SURE), which facilitates the registration and cancellation of registrants. 25 Pa.C.S. § 1222.

11.     Using the SURE system, "Commissions shall institute a program to protect the integrity of the electoral process and to ensure the maintenance of accurate and current registration records." 25 Pa.C.S. § 1901(a).

12.     Like the NVRA, Pennsylvania has a state public disclosure law pertaining to election list maintenance records. State law requires that all registration list maintenance records maintained by the Defendants be made available for public inspection and duplication:

> The department and each commission shall preserve for two years and shall make available for public inspection and, where available, photocopying at a reasonable cost **all records** concerning the implementation of programs and activities conducted for the purposes of ensuring the accuracy and currency of official lists of registered electors except to the extent that the records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular qualified elector is registered.

25 Pa.C.S. § 1405(b)(1) (emphasis added).

4

13.     When the registration of a registered elector is cancelled, election officials must "mark on all registration records of the elector the word 'canceled' and the date and cause of cancellation." 25 Pa.C.S. § 1904(a). These records are subject to public inspection under NVRA.

14.     Election officials must then "remove any registration records pertaining to the elector" and retain the cancellation records "separate from registered electors for five years." *Id*. Upon cancellation, election officials must "promptly update information contained in its registration records" using the SURE system. *Id*. Records of removal and cancellations are subject to public inspection under the NVRA.

15.     The names of prospective jurors for the federal and state courts of Pennsylvania are drawn from a pool of names created using the lists of registered voters. 42 Pa.C.S. § 4521(a)(2); *United States v. Green*, No. 10-186, 2011 U.S. Dist. LEXIS 115542, at *4 (W.D. Pa. Oct. 6, 2011) (the "names of grand and petit jurors selected to serve . . . shall be selected at random from the voter registration lists of all the counties within the relevant divisions") (citations and quotations omitted).

16.     Only citizens are qualified to serve on juries in Pennsylvania. 42 Pa.C.S. § 4502(a).

17.    The inclusion of noncitizens on voter registration lists risks the inclusion of non-qualified noncitizens on federal and state juries.

18.    Furthermore, the inclusion of non-qualified noncitizens in the prospective jury pools imposes on clerks of court who use defective lists various costs associated with the identification and removal of unqualified jurors during the jury selection process.

**Noncitizen Registration and Voting is a Crime**

19.    United States citizenship is a requirement to register and to vote in Pennsylvania. 25 Pa.C.S. § 1301(a)-(b).

20.    In Pennsylvania, it is a misdemeanor, punishable by up to five years in prison, for a noncitizen (or other ineligible individual) to apply for voter registration. 25 Pa.C.S. § 1703(a)(1); 25 Pa.C.S. § 1703(b).

21.    Registration and voting by a noncitizen is criminalized under multiple federal felony statutes:

      a.  18 U.S.C. § 611 (criminalizes voting by illegal aliens in federal elections);

      b.  18 U.S.C. § 911 (criminalizes representing oneself to be a United States citizen);

      c.  18 U.S.C. § 1015(f) (criminalizes false statements in order to register to vote in any federal, state, or local election);

    d.  52 U.S.C. § 20511(2) (criminalizes the fraudulent submission of

        voter registration applications and the fraudulent casting of ballots)

22.    Election officials in Pennsylvania commit one or more state offenses

when they knowingly allow the registration of a noncitizen or accept votes from a

noncitizen.

23.    It is misdemeanor, punishable by up to five years in prison, for an

election official to "knowingly register[] or permit[] the registration of an applicant

not lawfully entitled to be registered." 25 Pa.C.S. § 1702(a).

24.    It is a misdemeanor, punishable by up to five years in prison, for an

election official to "[k]nowingly accept the vote of an individual not registered" to

vote or "[k]nowingly receive a vote from a person falsely claiming to be a

registered elector." 25 Pa.C.S. § 1705(a)(2)-(3).

**The Discovery of Noncitizen Registration and Voting in the Commonwealth**

25.    Investigations by the Foundation and others have revealed that

noncitizens are registering and voting in the Commonwealth.

26.    In 2015, the Foundation submitted a request pursuant to the NVRA

for list maintenance records maintained by the Philadelphia City Commission.

27.    Records obtained by the Foundation showed that between 2013 and

2015, at least 86 registrations in the City of Philadelphia were cancelled because

election officials determined that the registrant was not a U.S. citizen. Public

Interest Legal Foundation, *Aliens and Felons: Thousands on the Voter Rolls in Philadelphia* at 2, October 4, 2016, available at https://publicinterestlegal.org/files/Philadelphia-Litigation-Report.pdf.

28.    In large measure, the illegal voter registrations detailed in these records were self-reported aliens. There was no active process in place to detect and remove them. Only self-reporting by aliens, who were concerned with jeopardizing their immigration status, led to their detection and removal from the rolls in Philadelphia.

29.    Of the 86 noncitizens whose registrations were cancelled, 40 cast a ballot in at least one election prior to cancellation. *Id*.

30.    The Foundation presented its findings in testimony to the State Government Committee of the Pennsylvania House of Representatives on October 4, 2016. Preparations for the November election and efforts to protect and improve the integrity of elections: Hearing before the State Government Committee of the House of Representatives, Oct. 4, 2016, transcript available at http://www.legis.state.pa.us/WU01/LI/TR/Transcripts/2016_0147T.pdf.

**Systematic Registration of Identified Aliens Through PennDOT**

31.    In September 2017, Al Schmidt, a Philadelphia city commissioner, revealed that a so-called "glitch" at Pennsylvania Department of Motor Vehicle branch offices was enabling noncitizens to register to vote when they applied for or

renewed their driver's licenses. Brennan, *Glitch let ineligible immigrants vote in Philly elections, officials say*, Philadelphia Inquirer, Sept. 20, 2017, http://www.philly.com/philly/news/politics/city/philly-voter-fraud-trump-immigrants-registration-commissioners-penndot-20170920.html.

32.     List maintenance records obtained by the Plaintiff from a number of county election officials in the Commonwealth—including those in Allegheny, Washington, Westmoreland, and York—plainly demonstrate that noncitizens have been registering to vote in the Commonwealth through a PennDOT administered process. The Defendants would possess counterpart and associated list maintenance documents as well as additional documents related to this defective list maintenance process.

33.     A small sample of list maintenance records received from Allegheny County election officials pursuant to an NVRA request are illustrative of both the existence of responsive records in the possession of the Department of State and also of the defects in list maintenance process, including the registration process administered at PennDOT offices. These records are attached to this Complaint as Exhibits A through G.[1]

---

[1] Pursuant to Federal Rule of Civil Procedure 5.2 and Local Rule 5.2, certain personal information has been redacted in these Exhibits. Additional information, such as driver's license numbers, alien registration numbers, and street addresses has also been redacted.

34.    In 2005, Othman Alamoudi registered to vote in Allegheny County through the PennDOT application process. Exhibit A at 1. In 2012, Mr. Alamoudi's voter registration was cancelled because election officials determined he was not a U.S. citizen. Exhibit A at 1, 8. In 2014, Mr. Alamoudi *re-registered to vote*, this time using the mail application process. Exhibit A at 1. Mr. Alamoudi then voted in the 2014 General Election. Exhibit A at 2. In 2015, Allegheny County elections officials cancelled Mr. Alamoudi's voter registration a second time when he moved out of the county. Exhibit A at 1. After relocating to Mercer County, Pennsylvania, Mr. Alamoudi *again re-registered* using the PennDOT application process and is currently an active registrant. Exhibit A at 1, 7. Records indicate that Mr. Alamoudi voted in the 2016 General Election. Exhibit A at 7.

35.    In 2002, Susan Hermanoche registered to vote in Allegheny County. Exhibit B at 1. In 2006, Ms. Hermanoche's voter registration was cancelled because election officials determined she was not a U.S. citizen. Exhibit B at 1. Since then, Ms. Hermanoche *has re-registered to vote twice*. Exhibit B at 1. Ms. Hermanoche has voted in several elections since she was flagged a noncitizen, including the 2008 Primary Election and the General Elections in 2010, 2012 and 2016. Exhibit B at 1, 6, 12. Prior to voting in the 2016 General Election, Ms. Hermanoche registered to vote through the PennDOT application process. She is currently an active registrant. Exhibit B at 1, 9.

36.     In 2007, Mildred Nyama registered to vote in Allegheny County through the PennDOT application process. Exhibit C at 1. Ms. Nyama then voted in a total of four elections, including the General Elections in 2008, 2012, and 2016. Exhibit C at 1-2. In 2014, Ms. Nyama wrote to elections officials to request cancellation of her registration due to the fact that she is not a U.S. citizen. Exhibit C at 3-5.

37.     In 2012, Devanathan Mudaliar registered to vote in Allegheny County through the PennDOT application process. Exhibit D at 1. In 2014, Mr. Mudaliar wrote to elections officials to request cancellation of his registration due to the fact that he is not a U.S. citizen. Exhibit D at 2-4. Mr. Mudaliar's letter explains that he registered to vote due to a "system error" "while going through the driving license pendot [sic] process." Exhibit D at 4.

38.     In 2009, Felipe Rojas-Orta registered to vote in Allegheny County through the PennDOT application process. Exhibit E at 2. Mr. Rojas-Orta then voted in three separate elections, including the 2009 Municipal Primary and the General Elections in 2010 and 2016. Exhibit E at 5. In 2017, Mr. Rojas-Orta wrote to election officials to request cancellation of his registration, explaining, "I am not a citizen." Exhibit E at 3.

39.     In 2006, Parshant Malhotra registered to vote in Allegheny County through the PennDOT application process. Exhibit F at 1. Mr. Malholtra then voted

11

in the 2007 Municipal Primary and the 2008 General Election. Exhibit F at 2. In 2013, Mr. Malholtra's registration was cancelled because election officials determined he is not a U.S. citizen. Exhibit F at 1.

40.     In 2012, Alfredo Lopez Figallo registered to vote in Allegheny County through the PennDOT application process. Exhibit G at 1. In 2018, Mr. Lopez Figallo wrote to election officials to request cancellation of his registration due to the fact that he is not a U.S. citizen. Exhibit G at 2. Mr. Lopez Figallo explained,

> On the day I was getting my drivers [sic] license, I registered to vote. My understanding was that as a permanent residende [sic] of the USA I could vote locally. I did not realize that I was no [sic] allowed to register in the first place.

Exhibit G at 2.

41.     On or around October 11, 2017, then-Pennsylvania Secretary of the State Pedro Cortes resigned from office.

42.     On October 25, 2017, the House State Government Committee held a hearing to examine the issue of noncitizen registration and voting, including the DMV "glitch" revealed by Commissioner Schmidt. Noncitizens Registered to Vote in Pennsylvania: Hearing before the State Government Committee of the House of Representatives, Oct. 25, 2017, transcript available at http://www.legis.state.pa.us /WU01/LI/TR/Transcripts/2017_0109T.pdf.

43.     A representative of the Foundation appeared at that hearing and provided testimony concerning noncitizens registering and voting in the Commonwealth and elsewhere in the United States. Testimony of Noel H. Johnson, available at http://www.legis.state.pa.us/WU01/LI/TR/Transcripts/2017_0109_0004_TSTMNY.pdf.

44.     At the October 25 hearing, Commissioner Schmidt provided written and oral testimony to the committee. Testimony of Philadelphia City Commissioner Al Schmidt, available at http://www.legis.state.pa.us/WU01/LI/TR/Transcripts/2017_0109_0001_TSTMNY.pdf.

45.     In his written testimony, Commissioner Schmidt revealed that an investigation by his office found "220 non-citizens who were registered to vote in Philadelphia at some point between 2006 and 2017." *Id*. at 1. Of those 220 noncitizens discovered, 90 had cast a total of 227 ballots, "with the largest number of votes (47) cast in the 2008 General Election." *Id*. Of those 220 noncitizens discovered, 168 had initially registered through PennDOT (DMV) or modified their voter registration record through PennDOT (DMV). *Id*. at 2.

46.     Upon information and belief, that information was shared with the Department of State prior to Commissioner Schmidt's testimony on October 25, 2017. *See* Transcript, Hearing before the State Government Committee of the House of Representatives at 5:15-19, Oct. 25, 2017, available at

http://www.legis.state.pa.us/WU01/LI/TR/Transcripts/2017_0109T.pdf ("We've received additional information this year, and Mr. Al Schmidt, the Vice Chair from the Philadelphia City Commissioners, who is one of the Commissioners over the elections in Philadelphia, he is going to be testifying here today also related to this issue.").

47.    At the October 25 hearing, Defendant Jonathan M. Marks, the Commissioner of the Bureau of Commissions, Elections, and Legislation, substantiated the revelation of Commissioner Schmidt.

48.    According to Defendant Marks, the Department of State "undertook an analysis of the statewide voter registration database to determine whether ineligible residents were registering and voting." Testimony of Jonathan Marks at 1, available at http://www.legis.state.pa.us/WU01/LI/TR/Transcripts/2017_0109_0002_TSTMNY.pdf.

49.    That analysis "found 1,160 records that indicate a registrant apparently self-reported and cancelled their registration because they were not citizens." *Id*. Again, like in Philadelphia, these were only cases where an illegally registered noncitizen self-reported his or her illegal registration. It does not capture a wider search of how many total aliens were registered to vote under the so-called PennDOT "glitch."

50.     Defendant Marks submitted the following data to the State

Government Committee regarding the Department of State's analysis of self-

reported aliens on Pennsylvania voter rolls:

- Approximately 79% (912) never voted.
- Approximately 21% (248) individuals had voted at least 1 time. Of those 248:
  - o 134 voted 1 time
  - o 51 voted 2 times
  - o 63 voted 3 or more times
  - o Total ballots cast by the 248 individuals: 642
- The 1,160 records identified were from 46 counties.
- The 248 registrants with records showing they voted at least one time before cancelling were from 30 counties.
- Of the 1,160 who self-reported statewide, approximately 66% (769) had initially applied through the Motor Voter system.

*Id*. at 1-2. Records concerning this data analysis are subject to the public inspection

provision of the NVRA.

51.     According to Defendant Marks, "In a deeper analysis of the years

2000 through 2017, [the Department of State] found 544 ballots were cast by the

identified registrants." *Id*. at 2.

52.     As indicated by Defendant Marks, the noncitizens analyzed by the

Department of State were only those noncitizens who "self-reported" their

noncitizen status to election officials. *Id*. at 1.

53.     On December 12, 2017, the Senate State Government Committee and

the Senate Transportation Committee held a joint hearing to discuss noncitizen

registration and voting in the Commonwealth. Motor Voter, Unlawful Voting and Cyber Security: Joint Hearing before the Senate State Government Committee and the Senate Transportation Committee, Dec. 12, 2017, video available at http://stategovernment.pasenategop.com/121217/.

54.     The Foundation submitted written testimony to the committees concerning noncitizens registering and voting in the Commonwealth. Testimony of J. Christian Adams, available at http://stategovernment.pasenategop.com/wp-content/uploads/sites/30/2017/12/adams.pdf.

55.     At the December 12, 2017 joint hearing, Defendant Marks and Defendant Acting Secretary of State Robert Torres provided written and oral testimony.

56.     Regarding the issue of noncitizens registering to vote through DMV offices, Defendant Torres explained it "is an issue that has extended over approximately twenty years." Testimony of Acting Secretary Torres at 30:15-30:38, video available at http://stategovernment.pasenategop.com/121217/.

57.     In written testimony, Defendant Torres explained that the Department of State is continuing to investigate noncitizens presently registered to vote. Specifically, Defendant Torres explained, "The Department's ongoing effort includes expert analysis of the State Uniform Registry of Electors (SURE) database and PennDOT's driver license database." Testimony of Acting Secretary

Torres at 2, available at http://stategovernment.pasenategop.com/wp-content/uploads/sites/30/2017/12/torres.pdf.

58.    Commissioner Schmidt again provided written and oral testimony at the December 12, 2017 joint hearing. Testimony of Al Schmidt, available at http://stategovernment.pasenategop.com/wp-content/uploads/sites/30/2017/12/schmidt.pdf.

59.    According to Commissioner Schmidt's testimony,

> When non- citizens apply for a driver's license at PennDOT, they are required to provide stay documents to show their legal status to remain in the U.S. for at least one year. PennDOT verifies these immigration documents electronically with the U.S. Department of Homeland Security and the applicant's driver's license record is marked using an INS Indicator.

*Id*. at 2.

60.    When an applicant applies for voter registration, he or she is asked to provide their Pennsylvania driver's license or PennDOT ID card number. *See* Department of State, PA Online Voter Registration Application, https://www.pavoterservices.pa.gov/pages/VoterRegistrationApplication.aspx. According to the application's instructions, "If you have a PA driver's license or PennDOT ID card number, you must use it" to register to vote. *Id*.

61.    Consequently, an individual's driver's license number can be used to verify whether someone is both a noncitizen (by the presence of the INS Indicator) and registered to vote (driver's license number is part of registration record). *See*

Testimony of Commissioner Schmidt at 62:28-63:17, video available at

http://stategovernment.pasenategop.com/121217/.

62.    In his oral testimony, Commissioner Schmidt explained that in July,

August, and September of 2017, his office began meeting with the Department of

State to discuss the issue of noncitizens registering to vote. Testimony of

Commissioner Schmidt starting at 60:18, video available at

http://stategovernment.pasenategop.com/121217/.

63.    According to Commissioner Schmidt, the meetings with the

Department of State resulted in an analysis that matched the driver's license

numbers of noncitizens with the driver's license numbers of registered voters

(hereafter, the "Noncitizen Matching Analysis"). Testimony of Commissioner

Schmidt starting at 63:17, video available at http://stategovernment.pasenategop

.com/121217/.

64.    In his oral testimony given at the October 25, 2017 hearing of the

House State Government Committee, Commissioner Schmidt stated that the

Department of State was in the process of completing the Noncitizen Matching

Analysis. Transcript, Noncitizens Registered to Vote in Pennsylvania: Hearing

before the State Government Committee of the House of Representatives at 51:4-8,

Oct. 25, 2017, available at http://www.legis.state.pa.us/WU01/LI/TR/Transcripts

/2017_0109T.pdf ("Well, respectfully, I think we'll be in a better position to

answer your question once the Department of State completes its match of voter

registrations with driver's license numbers with INS indicators and then sort of

working it down from there.").

65.    According to Commissioner Schmidt, the Department of State has

completed the Noncitizen Matching Analysis. In his oral testimony, Commissioner

Schmidt stated that the analysis revealed over 100,000 matches, meaning that the

analysis showed over 100,000 noncitizens who were presently registered to vote in

Pennsylvania. Testimony of Commissioner Schmidt starting at 63:40, video

available at http://stategovernment.pasenategop.com/121217/. Records concerning

this analysis of voter registration records are subject to public inspection rights

under the NVRA.

66.    In his written testimony (and again in his oral remarks) Commissioner

Schmidt called on the Department of State to "[r]elease the results of the data

matching of PennDOT driver's license numbers with INS Indicators against

driver's license numbers of registered voters in the statewide voter registration

database to the County Boards of Election," and contact the implicated individuals

so they can "take action to cancel their voter registration status prior to the next

election." Testimony of Commissioner Schmidt at 3, available at

http://stategovernment.pasenategop.com/wp-content/uploads/sites/30/2017/12/

schmidt.pdf; *see also*, Testimony of Commissioner Schmidt starting at 67:45,

video available at http://stategovernment.pasenategop.com/121217/.

**The Foundation Sought and was Denied Access to Records Concerning
Noncitizen Registrants**

67.     On October 23, 2017, the Foundation contacted Defendant Marks of

the Department of State's Bureau of Commissions, Elections, and Legislation via

letter (hereafter, the "DOS Records Request," attached as Exhibit H).

68.     Pursuant to the public records inspection provision of the NVRA, 52

U.S.C. § 20507(i), the Foundation's DOS Records Request sought the opportunity

to inspect records concerning noncitizen registrants, including records related to

their removal from the voter registration lists and referrals to law enforcement.[2]

*See* Exhibit H.

69.     The DOS Records Request specifically identified as responsive "all

voter records that were referenced in recent news media reports regarding

individuals improperly exposed to registration prompts due to a 'glitch' in

PennDOT's Motor Voter compliance system," and records related to a "review" of

these records by the Department of State. Exhibit H at 1.

70.     At the October 25, 2017 hearing of the House State Government

Committee, Defendant Marks confirmed that the Department had "begun to review

the data on this issue" and that an "analysis" had been conducted concerning, at

_____

[2] The entire scope of the requested records is available at Exhibits H and I.

least, the 1,160 noncitizens who had self-reported their statute as noncitizens and who had sought cancellation of their registrations. Testimony of Defendant Marks at 1, Oct. 25, 2017, available at http://www.legis.state.pa.us/WU01/LI/TR/Transcripts/2017_0109_0002_TSTMNY.pdf.

71.    On October 25, 2017, a representative of the Foundation visited the Department of State's Bureau of Commissions, Elections, and Legislation to inspect the requested records.

72.    An office employee informed the Foundation's representative that the DOS Records Request had been received, but that the requested records were not available for inspection. The request to inspect the records was denied.

73.    The office employee notified someone in the Office of the Chief Counsel that the Foundation's representative was in the office to inspect the requested records.

74.    After a short while, a representative from the Office of the Chief Counsel informed the Foundation's representative that the office was in the process of reviewing the DOS Records Request and that the office would provide a response via email in the next few days.

75.    The Department of State did not permit the Foundation to inspect the requested records.

76.     On October 30, 2017, Rebecca Fuhrman, an Agency Open Records

Officer in the Office of the Chief Counsel, sent a letter via email to the Foundation.

The letter acknowledged receipt of the DOS Records Request, but indicated that it

was being processed under the Pennsylvania Right-to-Know Law, 65 P.S. §§

67.101 *et seq*. The letter asked for an additional 30 days—or until November 29,

2017, to provide a response.

77.     In a response sent via email, the Foundation again notified the

Department of State that the Foundation's DOS Records Request was made

pursuant to the NVRA, not the Pennsylvania Right-to-Know Law.

78.     In an email dated October 30, 2017, Ms. Fuhrman stated, "The

Department acknowledges that your request is made pursuant to the NVRA."

79.     No further response was received from the Department of State by

their internal deadline of November 29, 2017.

80.     When no response was given, on December 4, 2017, the Foundation

wrote to Defendant Marks and Ms. Fuhrman to ascertain the status of the DOS

Records Request and to clarify the scope of the requested records, explaining that

the DOS Records Request includes records related to the Noncitizen Matching

Analysis: "results (full or interim) from an aforementioned official 'review' of

voter data compared against PennDOT's database of customers to identify voters

with matching driver profiles containing noncitizen designations" (hereafter the "DOS Clarification Letter, attached as Exhibit I).

81.    The DOS Clarification Letter advised Defendant Marks's office that a representative of the Foundation would again be visiting his office on December 6, 2017 to inspect the requested records. Exhibit I at 2.

82.    In an email to the Foundation dated December 5, 2017, Kathleen Kotula, Deputy Chief Counsel for the Department of State, stated that the requested documents would not be available for inspection on December 6 and that a separate email detailing the reasons for the unavailability would follow.

83.    On December 6, 2017, a representative of the Foundation again visited the office of the Department of State's Bureau of Commissions, Elections, and Legislation to inspect the requested records.

84.    An employee for the Department of State, Jessica Mathis, advised the Foundation's representative that the requested records could not be inspected and that "an email had been sent" regarding the matter.

85.    At that time, no such email had been received by the Foundation.

86.    The Department of State did not permit inspection of the requested records, including records related to the Noncitizen Matching Analysis.

87.    On December 20, 2017, Deputy Chief Counsel Kotula emailed a letter from Defendant Marks to the Foundation regarding the DOS Records Request.

88.    Defendant Marks's letter stated, "[T]he Department does not agree that the NVRA entitles you to access the records you seek."

89.    In the letter, the Department of State takes the position that the NVRA's public inspection provision is limited to list maintenance records that concern registrants who were determined to be ineligible "by reason of death or a change of residence."

90.    As was stated by the Foundation in the Records Request, the NVRA's public inspection provision, 52 U.S.C. § 20507(i), does not contain the limitation advanced by the Department of State. Rather, the public inspection provision requires the Department of State to "make available for public inspection . . . **all records** concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters. . . ." 52 U.S.C. § 20507(i)(1) (emphasis added).

91.    The Department of State's letter further states,

> [E]ven assuming *arguendo* that the NVRA would apply to a systematic removal program regarding non-citizens, the Department does not currently have such a program in place. As such, no responsive documents exist.

92.    The NVRA's public inspection provision is not limited to records concerning "systematic removal program[s]," but applies to all records concerning "the implementation of programs and activities." 52 U.S.C. § 20507(i).

93.     Furthermore, the Department of State's position is contradicted by several sources, including the letter from Defendant Mark's itself, in which the Department states that it is "actively reviewing" the matter of noncitizen registration. The Department's statement is also contradicted by the testimony of Defendant Marks, Defendant Torres, and Commissioner Schmidt, which details activities by the Department concerning the registration of noncitizens.

94.     The requested records, including records related to the Noncitizen Matching Analysis, are "records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters. . . ." 52 U.S.C. § 20507(i)(1). Those records must be made available under the NVRA's public inspection provision.

95.     The Department of State's refusal to allow inspection of requested records, including records related to the Noncitizen Matching Analysis, is a violation of the public inspection provision of the NVRA.

96.     After receiving the letter denying the DOS Records Request, the Foundation sent a response via letter to the Department of State (hereafter, the "DOS Violation Notice," attached as Exhibit J).

97.     As required by the private-right-of-action provision of the NVRA, 52 U.S.C. § 20510, the DOS Violation Notice informed the Department of State that

its refusal to allow inspection of the requested records is a violation of the NVRA's public inspection provision. Exhibit J at 1.

98.    The Violation Notice further informed the Department of State that because the violation of the NVRA occurred within 120 days of an election for federal office,[3] the Department of State had 20 days to cure the violation or it could face "a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation." 52 U.S.C. § 20510(b)(2).

99.    No further correspondence has been received from the Department of State.

100.    The Department of State has not made the requested records available for public inspection, but has intentionally and repeatedly denied the Foundation access to the request records.

101.    The Foundation is not the only entity that has requested access to the Department of State's records concerning registration by noncitizens and the Noncitizen Matching Analysis. On November 29, 2017, Daryl Metcalfe, Chairman of the House State Government Committee, wrote to the Department of State to request, *inter alia*, records

> indicat[ing] the total number of record matches obtained by comparing driver's license numbers and PennDOT ID card numbers

---

[3] On October 23, 2017 Governor Wolf issued a Writ of Election setting a date of March 13, 2018 for a special election to fill Pennsylvania's vacant 18th Congressional District.

of registered electors in the SURE system database with driver's license numbers and PennDOT ID card numbers of individuals who hold a driver's license or PennDOT ID card, whose license or ID card record includes an INS indicator.

Upon information and belief, the Department of State has not provided the requested records to Chairman Metcalfe.

**Defendants Have Violated the NVRA by Refusing to Provide Inspection of the Requested Records**

102.    The records requested from Defendants are records "concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters. . . ." 52 U.S.C. § 20507(i)(1).

103.    Under the NVRA, the Defendants are obligated to make the requested records available for public inspection and photocopying. Defendants have not done so and are therefore in violation of law.

**Defendants' Violations of Law Have Harmed the Foundation and the Public**

104.    As an integral part of its public interest mission, the Foundation gathers and disseminates information about compliance by state and local officials with federal election statutes, including election integrity statutes.

105.    Using records and data compiled through use of the NVRA's public inspection provision, the Foundation has produced written reports concerning the registration and voting activity of noncitizens. These reports have been published

on the Internet. *See* Public Interest Legal Foundation, *Alien Invasion II: The Sequel to the Discovery and Cover-up of Non-citizen Registration and Voting in Virginia*, May 29, 2017, available at https://publicinterestlegal.org/blog/alien-invasion-ii-sequel-discovery-cover-non-citizen-registration-voting-virginia/; Public Interest Legal Foundation, *Garden State Gotcha*, Sept. 11, 2017, available at https://publicinterestlegal.org/files/Garden-State-Gotcha_PILF.pdf. One such report concerns noncitizen registration and voting in Philadelphia, Pennsylvania. Public Interest Legal Foundation, *Aliens & Felons: Thousands on the Voter Rolls in Philadelphia*, October 4, 2016, available at https://publicinterestlegal.org/files/Philadelphia-Litigation-Report.pdf.

106.   The Foundation has disseminated this information through media and press sources. Representatives of the Foundation have appeared on national television programs discussing the inadequacies of state election systems in preventing aliens from registering and voting. The Foundation believes that transparency is an important tool to keep voter rolls free of illegal registrants.

107.   By denying the Foundation access to the requested records Defendants have impaired and will impair the Foundation from carrying out its mission.

108.   A central activity of the Foundation is to promote election integrity and compliance with federal and state statutes which promote the integrity of

elections. The Defendants' violations of NVRA have impaired and will impair the Foundation from carrying out this its mission.

109.   The failure of the Defendants to comply with their obligations under the NVRA has also undermined the confidence of Pennsylvania's properly registered voters in the integrity of the voter registration rolls, and, accordingly, has undermined the integrity of elections held across the Commonwealth of Pennsylvania.

110.   Defendants have not cured their violation of the NVRA within the 20-day period applicable within 120 days of a federal election under the NVRA. 52 U.S.C. § 20510(b)(2).

111.   The Foundation has spent considerable time and financial resources in an effort to obtain the requested records and to improve the accuracy of voter rolls across the Commonwealth.

112.   The Defendants' failure to permit inspection and duplication of the requested records pursuant to the NVRA has frustrated, impeded and harmed the efforts of the Foundation.

## COUNT I

### Violation of the NVRA
### Failure to Permit Inspection and Duplication of List Maintenance Records

113.   Plaintiff realleges paragraphs 1 through 112 as if fully stated herein.

114.    Defendants have failed to permit inspection and duplication of records concerning Defendants' implementation of programs and activities for ensuring the accuracy and currency of official lists of eligible voters, in violation of Section 8 of the NVRA, 52 U.S.C. § 20507(i). *See Project Vote v. Long*, 682 F.3d 331, 334-335 (4th Cir. 2012) (The NVRA requires local election officials to provide such data to the public).

115.    Defendants have not cured their violation of law within the 20-day period afforded them by the NVRA for violations that occur within 120 days of an election for federal office. 52 U.S.C. § 20510(b)(2).

116.    Plaintiff has suffered an irreparable informational injury as a direct result of Defendants' violations of Section 8 of the NVRA because the Plaintiff does not have the data and records requested. The NVRA confers upon Plaintiff a right to information, and by denying that information to the Plaintiff, the Defendants have caused a concrete injury to the Plaintiff.

117.    Plaintiff will continue to be injured by the Defendants' violations of Section 8 of the NVRA unless and until the Defendants are enjoined from continuing to violate the law.

118.    Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment:

1.    Declaring that Defendants are in violation of Section 8 of the NVRA;

2.    Ordering the Defendants to provide to the Plaintiff the records concerning their implementation of programs and activities to ensure the accuracy and currency of voter registration lists;

3.    Ordering the Defendants to pay Plaintiff's reasonable attorney's fees, including litigation expenses and costs, pursuant to 52 U.S.C. § 20510(c); and

4.    Granting Plaintiff further relief that this Court deems just and proper.

Dated: February 26, 2018

Respectfully submitted,

For the Plaintiff Public Interest Legal Foundation:

_____

Linda A. Kerns, Esquire*
LAW OFFICES OF LINDA A. KERNS, LLC
1420 Locust Street – Suite 200
Philadelphia, PA 19102
PA Atty ID 84495
Tel:  (215) 731-1400
Fax: (215) 701-4154
linda@lindakernslaw.com
*General admission scheduled for March 9, 2018.

J. Christian Adams (Va. Bar # 42543)*
Noel H. Johnson (Wis. Bar # 1068004)*
Attorneys for Public Interest Legal Foundation, Inc.
32 E. Washington St.
Ste. 1675
Indianapolis, IN 46204

Tel: (317) 203-5599
Fax: (888) 815-5641
adams@PublicInterestLegal.org
njohnson@PublicInterestLegal.org
*Pro Hac Vice application to be filed*

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the

foregoing is true and correct to the best of my knowledge, information and belief.

Dated: February 26, 2018

_____
Linda A. Kerns
Counsel for Plaintiff